## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **FERNANDO CORONADO,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**K. OLSEN and JACOB HILL, West Valley City Police Officers, and WEST VALLEY CITY, a political subdivision,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Case No. 2:18-cv-83**<br><br>**Judge Clark Waddoups** |

Before the court are cross motions for summary judgment. Defendants Kenneth Olsen ("Officer Olsen"), Jacob Hill ("Officer Hill"), and West Valley City move the court for summary judgment on Plaintiff's claims of excessive force and unconstitutional policies and practices[1] (ECF No. 66), and Plaintiff Fernando Coronado ("Mr. Coronado") seeks partial summary judgment on the issue of Defendants' liability (ECF No. 82). Both motions have been fully briefed, and the court heard argument on the same at a September 3, 2020 hearing. At its core, this case, and the current cross motions for summary judgment, presents a question that is extraordinarily difficult to answer: was the force used by Officer Olsen and Officer Hill (together the "Defendant Officers") reasonable? Having reviewed the pleadings and submitted materials and considered the arguments of counsel, the court finds that it was. As such, and for the reasons stated herein, the court enters this order **GRANTING** Defendants' Motion for Summary Judgment and **DENYING** Mr. Coronado's Motion for Partial Summary Judgment.

---

[1] By Order entered February 15, 2019, the court dismissed Mr. Coronado's claim for flagrant violation of rights and Tabeththa Coronado's claim for loss of consortium. (ECF No. 49). The claims targeted by Defendants in their Motion for Summary Judgment are therefore all of Mr. Coronado's remaining claims in this matter.

**LEGAL STANDARD**

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(A). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001). "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

**UNDISPUTED FACTS**

Both parties agree that there are no material facts in dispute in this matter. Indeed, many of the facts relevant to the motions before the court are evident from a video of the incident captured by the body camera worn by Officer Olsen (the "Video") (ECF No. No. 18-1)[2]. Mr. Coronado argues that *only* the facts depicted in the Video are relevant to the pending motions and that the court's consideration of any additional facts creates a dispute of material facts that precludes the granting of summary judgment. As will be discussed more thoroughly below, events that occurred prior to the Defendant Officers' interaction with Mr. Coronado, and were

---

[2] Multiple versions of the Video have been filed by the parties, differing only in starting point, ending point, and length. The court finds this version, which was initially filed by Defendants in support for their Motion to Dismiss (ECF No. 18), most succinctly captures only the actions that are relevant to this matter.

therefore not captured on the Video, are relevant to the "totality of the circumstances" analysis that this court is required to undertake.  As such, such facts are relevant, and material, to the pending motions and must be considered here.  The court's consideration of facts outside of the Video does not create a "genuine issue of material fact" that precludes summary judgment. Indeed, Mr. Coronado's objection to such facts being considered focuses on the facts' relevance, not on a dispute as to their truth or accuracy.  As such, the court accepts as undisputed the following fact based on the Video, the submissions of the parties, and the sworn testimony of the Defendant Officers.[3]

1.      On August 3, 2016, Mr. Coronado's wife, Tabeththa Coronado ("Mrs. Coronado"), called 911 to report that Mr. Coronado was threatening to commit suicide.  (ECF No. 66 at 11–12; ECF No. 82 at 9–10).

2.      Officers from the West Valley Police Department responded to Mrs. Coronado's 911 call and arrived at Mr. Coronado's apartment building in West Valley City, Utah.  (ECF No. 66 at 12–13; ECF No. 82 at 10).  After arriving on the scene, officers contacted Mr. Coronado on his cell phone, but Mr. Coronado refused to exit his apartment.  (ECF No. 66 at 12–13; ECF No. 82 at 10).  The West Valley City Special Weapons and Tactics Unit (the "SWAT Team") was ultimately called to report to the scene.  (ECF No. 66 at 12–13; ECF No. 82 at 10).

3.      The Defendant Officers were both members of the SWAT Team and responded to the scene.  (*See* Olsen Deposition, ECF No. 77-5, at 30:9–23; Hill Deposition, ECF No. 77-6, at

---

[3] After they gave depositions under oath, the Defendant Officers submitted declarations in this matter.  (*See* ECF No. 67-16; ECF No. 67-17).  In his Reply in Support of this Motion for Partial Summary Judgment (ECF No. 102), Mr. Coronado asks the court to not rely on these declarations, but he does not move to quash or exclude the documents. While the court notes that some of the representation contained in the declarations vary from, and in some instances contradict, the testimony that the Defendant Officers gave at their depositions, it need not weigh the propriety or merits of the declarations, as they were not made "under penalty of perjury" and will not, therefore, be considered by the court in deciding this matter.  *See* 28 U.S.C. § 1746; FED. R. CIV. P. 56(c)(1).

12:16–13:6).

4.      Over the course of several hours, officers from West Valley Police Department and/or a SWAT Team negotiator spoke to and negotiated with Mr. Coronado to try to get him to exit his apartment.  (*See* ECF No. 66 at 20–21; ECF No. 82 at 6; Olsen Deposition, ECF No. 77-5 at 122:5–16; Hill Deposition, ECF No. 77-6 at 44:25–45:14).

5.      As these communications commenced, the Defendant Officers received additional information about the situation and Mr. Coronado.[4]

6.      Before he encountered Mr. Coronado, Officer Olsen was told that Mr. Coronado:

  a.   was armed and had barricaded himself in his apartment.  (Olsen Deposition, ECF No. 77-5, at 68:10–11).

  b.   had a knife and a bolt action rifle within his apartment.  (*Id.* at 108:1–8).

  c.   was threatening to commit suicide.  (*Id.* at 43:6–18; 97:23–98:4; 102:23–103:5; 103:14–24).

  d.   had been drinking and was potentially intoxicated.  (*Id.* at 64:12; 107:20–25; 116:11–15; 121:10–17).

  e.   had threatened his wife and anyone else in his home.  (*Id.* at 42:24–43:1; 103:14–24; 154:16–20).

  f.   had threatened to kill any officers that came through his door.  (*Id.* at 103:14–24).

---

  [4] While the Defendant Officers obtained some information before they arrived at the scene, they learned most of it on the scene as negotiations with Mr. Coronado unfolded.

  g. had made statements that he was going to blow up his apartment up and that he had the apartment booby trapped.  (*Id*. at 103:14–24).

  h. had claimed to have military training.  (*Id*. at 103:14–24).

7. Before he encountered Mr. Coronado, Officer Hill was told that Mr. Coronado:

  a. was allegedly homicidal and suicidal. (Hill Deposition, ECF No. 77-6, at 39:7–18).

  b. had threatened to kill himself and he had held a knife to his throat.  (*Id*. at 42:1–8; 42:16–19).

  c. had made comments that he wanted to commit suicide "by cop."  (*Id*. at 42:1–8).

  d. had access to a rifle and knife.  (*Id*. at 42:1–8).

  e. had threatened to kill people in the apartment complex.  (*Id*. at 45:10–32).

  f. had stated that he was going to kill officers on the scene.  (*Id*. at 45:10–32).

  g. had claimed to have been a sniper in the military.  (*Id*. at 45:10–32).

8. Mr. Coronado lived on the fourth floor of his apartment building.  (ECF No. 82 at 6).  His apartment was accessed by an open-air cement landing, and open-air stairwells were located on the landing's north and south ends (the "North Stairwell" and the "South Stairwell").  (*See* Video, ECF No. 18-1, at 0:00–0:26).  Mr. Coronado's apartment was closest to the North Stairwell.[5]  (*See id*.)

9. While officers spoke to and negotiated with Mr. Coronado to try to get him to exit

---

[5]  *See, infra*, Note 6.

his apartment, members of the SWAT Team, including the Defendant Officers, positioned

themselves on the North Stairwell and South Stairwell leading to the fourth-story landing on

which Mr. Coronado's apartment was located.  (*See* Olsen Deposition, ECF No. 77-5 at 35:7–

37:17, 111:10–112:17; Video, ECF No. 18-1, at 0:00–0:26).  The Defendant Officers were

positioned on the North Stairwell between the third and fourth-story landings of the building.[6]

(*See* Olsen Deposition, ECF No. 77-5 at 37-25–38:12; Hill Deposition, ECF No. 77-6 at 46-17–

25; Video, ECF No. 18-1, at 0:00–0:26).  They remained in this position for "several" hours

while they waited for Mr. Coronado to exit his apartment.  (*See* Hill Deposition, ECF No. 77-6 at

44:23–45:5; Olsen Deposition, ECF No. 77-5 at 111:10–112:17; Video, ECF No. 18-1, at 0:00–

0:12).

10.     Mr. Coronado ultimately agreed to exit his apartment.  (ECF No. 66 at 17; ECF

No. 82 at 11; Video, ECF No. 18-1, at 0:00–0:12).  When Mr. Coronado exited his apartment, he

wore only a pair of shorts with a belt (or band) around his waist.  (*See* Video, ECF No. 18-1 at

0:12–0:50).  He was barefoot and naked from the waste up.  (*See id*.).

11.     Once Mr. Coronado exited his apartment, the officers began giving him

overlapping orders.  (*See id*.; ECF No. 83-10).  Mr. Coronado was never told that he was under

arrest.  (*See* Video, ECF No. 18-1 at 0:00–0:50; ECF No. 83-10).  At his deposition, Mr.

Coronado gave conflicting testimony as to whether he understood that the officers were there to

---

[6]  In his Motion for Partial Summary Judgment, Mr. Coronado asserts that the Defendant Officers were positioned on the South Stairwell.  (ECF No. 82 at 11–12).  This contradicts the deposition testimony of Officer Olsen.  (*See* Olsen Deposition, ECF No. 77-5 at 37-25–38:12).  While it is unclear whether Mr. Coronado's representation is a mistake or a dispute, the court notes that the discrepancy is immaterial.  The material issues here, as they relate to the North/South Stairwells are, as detailed herein, that: 1) the Defendant Officers were in the stairwell closest to Mr. Coronado's apartment door; 2) that when Mr. Coronado exited his apartment  he approached the opposite stairwell; 3) that while Mr. Coronado was conversing with officers on that opposite stairwell, the Defendant Officers came onto the landing and approached Mr. Coronado from the rear; and 4) by doing so, the Defendant Officers were standing between Mr. Coronado and his apartment door.  Each of these facts is clearly shown in the Video and is therefore not in dispute.  (Video, ECF No. 18-1 at 0:00–0:45).

arrest him.[7]  (Mr. Coronado Deposition, ECF No. 83-3 at 164:22–165:3, 172:23–173:1).  At first

he said he understood that they were there to "take [him] somewhere" but not to "arrest [him],"

but when he was later asked whether he understood that the officers were there to arrest him, he

answered "yes."  (*See id.*).

12.     Upon exiting his apartment, Mr. Coronado walked away from his apartment and

approached the South Stairwell,[8] where he interacted with the officers there positioned.  (*See*

Video, ECF No. 18-1, at 0:12–0:45).  As he spoke with those officers, officers that had been

position on the North Stairwell,[9] including the Defendant Officers, came onto the fourth-story

landing.  (*See id.* at 0:00–0:45).

13.     As the officers that had been positioned on the North Stairwell,[10] including the

Defendant Officers, came onto the fourth-story landing, they approached Mr. Coronado from the

rear.  (*See id.* at 0:12–0:45).  By doing so, the Defendant Officers stood between Mr. Coronado

and his apartment door.  (*See id.*).

14.     As the Defendant Officers approached Mr. Coronado, they aimed their Tasers at

Mr. Coronado's back, and the Tasers were ready to be deployed.  (*See id.* at 0:20–0:49; Olsen

Deposition, ECF No. 77-5 at 124:5–18; Hill Deposition, ECF No. 77-6 at 66:17–23, 77:22–

78:5).

---

[7]  Mr. Coronado argues that the court should discount this fact because it is speculative, because Mr. Coronado's memory was impaired by his brain injury, and/or because he was too intoxicated on the date in question to understand that the officers were there to arrest him.  (*See* ECF No. 76 at 36–37; ECF No. 27–28; ECF No. 102 at 17–18).  While Mr. Coronado's arguments are undercut by the numerous instances where he references his thoughts and actions from the date in question and favorably cites his own deposition testimony, (*see*, e.g., ECF No. 76 at 11–12, 15, 16–17, 22; ECF No. 82 at 10–12, 17, ECF No. 102 at 12–13), as is more thoroughly discussed below, Mr. Coronado's testimony is not sufficiently clear for the court to conclude that he did, in fact, understand that he was under arrest, and on Defendants' motion for summary judgment, the court assumes he did not.  *See*, *infra*, Section I.A.3.

[8]  *See*, *supra*, Note 6.

[9]  *See*, *supra*, Note 6.

[10]  *See*, *supra*, Note 6.

15.     After the Defendant Officers were on the fourth-story landing, and had positioned themselves between Mr. Coronado and his apartment door, Mr. Coronado turned to them, appearing to notice them for the first time.  (*See id*. at 0:44–0:49).  At this point, the Defendant Officers' Tasers were pointed at Mr. Coronado's torso.  (*See id*.).  Mr. Coronado then took approximately three steps in their direction.  (*See id*.).  As Mr. Coronado was taking those steps, Officer Hill twice ordered him to "get on the ground."  (*See id*. at 0:45–0:47; Hill Deposition, ECF No. 77-6 at 110:10–17).

16.     Mr. Coronado did not comply with the two commands, and as he was being ordered to get on the ground for a third time, one of the Defendant Officers[11] deployed his Taser, which struck Mr. Coronado in the torso.  (*See* Video, ECF No. 18-1 at 0:45–0:49).  The other Defendant Officer deployed his Taser immediately thereafter, which also struck Mr. Coronado in the torso.  (*See id*. at 0:47–0:49).

17.     Mr. Coronado then collapsed and fell forward, striking his head on the floor of the landing and a door.  (*See id*. at 0:47–0:52).

18.     Approximately thirty-seven seconds (0:37) passed between the moment that Mr. Coronado exited his apartment and the moment that he was Tasered by the Defendant Officers. (*See id*. at 0:12–0:49).

19.     At his deposition, Mr. Coronado testified that he did not know why he walked towards the Defendant Officers.  (*See* Mr. Coronado Deposition, ECF No. 83-3 at 217:7–9, 224:21–225:6, 228:12–15).  He did, however state that he did not intend to harm the Defendant

---

[11]  It is unclear, based on the record before the court, which of the Defendant Officers was the first to deploy his Taser.  However, this question is immaterial to the issues before the court, and the court notes that, as is shown by the Video, less than a second separate the firing of the two Tasers.  (Video, ECF No. 18-1 at 0:47–0:49).

Officers or push them over the stairs or railing.  (*See id*. at 228:17–229:9).  Mr. Coronado also testified that he had not rigged his apartment "to blow up if someone came in."  (*see Id*. at 194:17–19).

20.     At his deposition, Officer Olsen testified that he viewed Mr. Coronado's advance towards him as a threat to his and other officers' safety.  Specifically, Officer Olsen stated that:

a.  He was worried that Mr. Coronado might push him down the steps of the building.  (Olsen Deposition, ECF No. 77-5 at 133:5–134:17).

b.  He knew that Officer Hill was either next to or behind him, and that he feared that Mr. Coronado could push him into Officer Hill and they both would fall. (*Id*. at 135:8–12).

c.  By coming towards the officers, Mr. Coronado was a threat because he moved quickly and had momentum that "could easily [have] put [Officer Olsen] on [his] heels."  (*Id*. at 134:23–135:2).

d.  Mr. Coronado's advance towards him as "aggressing towards [him]," and he perceived that Mr. Coronado's hands were in fists as he was approaching him and that Mr. Coronado was not going to stop.  (*Id*. at 127:14–18).

e.  When Mr. Coronado started to approach him, he retreated but did not have far to go before he was "backed up to a stairwell where cement stairs" which led "down a flight of stairs and over three-and-a-half floors down to the cement" which was "very dangerous."  (*Id*. at 133:18–23).

f.  He perceived Mr. Coronado's advance towards him as "a violent action" perceived that Mr. Coronado's goal in doing so was to "get past [him], to push

[him] down the stairs, to push [him] out of the way, [or to] get back into his apartment and cause further harm." (*Id*. at 136:9–14).

21.     At his deposition, Officer Hill similarly testified that he viewed Mr. Coronado's advance towards him as a threat, stating that Mr. Coronado "advance[d] towards [him] aggressively" and that Mr. Coronado "aggressed" towards him with his fists clenched and his chest puffed. (Hill Deposition, ECF No. 77-6 at 73:11–22; 90:20–91:15). Officer Hill also viewed Mr. Coronado's interaction with SWAT Team members on the South Stairwell[12] as being aggressive, noting that Mr. Coronado advanced toward those officers, cursed at them, pounded his chest, and yelled and screamed at them before he turned and aggressively advanced towards him. (*Id*. at 90:20–91:15).

22.     At his deposition, Officer Olsen testified that a goal of the SWAT Team was to prevent Mr. Coronado from reentering his apartment. Specifically, he testified that:

a.   When Mr. Coronado exited his apartment, the door closed but did not latch. (Olsen Deposition, ECF No. 77-5 at 49:16–18).

b.   He feared that Mr. Coronado could get back into his apartment. (*Id*. at 69:22–25; 131:18–134:8). This fear was based on threats that Mr. Coronado had made and Officer Olsen's belief that if Mr. Coronado reentered his apartment, everyone in the vicinity would be in danger. (*Id*. at 134:18–22).

c.   The members of the SWAT Team flanked Mr. Coronado from both sides to keep him out of the apartment and block his reentry. (*Id*. at 122:22–25; 50:4–7).

---

[12] *See*, *supra* Note 6.

       d.   He feared that Mr. Coronado would knock over or push him and Officer Hill

and then get to his apartment.  (*Id*. at 135:7–12; 138:9–14).

23.     Officer Hill similarly testified at his deposition that part of reason that the SWAT

Team members were on landing was to prevent Mr. Coronado from going back into his

apartment.  (*See* Hill Deposition, ECF No. 77-6 at 66:24–67:20).

24.     As a result of the above-described incident, Mr. Coronado was charged with six

misdemeanor crimes: 1) threatening with or using dangerous weapon in a fight or quarrel; 2)

threat of violence (domestic violence); 3) commission of domestic violence in the presence of a

child; 4) threat of violence; 5) interference with peace officer; and 6) intoxication.  (*See* ECF No.

67-12).

25.     Mr. Coronado ultimately pled guilty to threatening with or using dangerous

weapon in a fight or quarrel and the remaining five charges against him were dismissed.  (*See*

ECF No. 67-13).

## DISCUSSION

In his Reply in Support of his Motion for Partial Summary Judgment, Mr. Coronado quotes

the recent Fourth Circuit decision in *Estate of Jones by Jones v. City of Martinsburg, W. Virginia*,

961 F.3d 661, 673 (4th Cir. 2020), in which the court reversed a district court's grant of summary

judgment on qualified immunity grounds, recognizing that allowing such an award to stand "would

signal absolute immunity for fear-based use of deadly force, which we cannot accept."  While the

court agrees without exception that police officers must act "with respect for the dignity and worth

of black lives"[13] and that the "death of [] black m[e]n at the hands of police . . . has to stop," it

---

[13]  The court would extend this statement to include all lives, regardless of the color of their skin.  Having respect for the lives that they are charged to protect is an essential key to police officers fulfilling their mission.

cannot allow such beliefs, no matter how important they are, to overshadow the facts of this case. *Id*.

Underlying this case is the question of did the Defendant Officers act reasonably in this situation. Should they have waited an extra second to see if Mr. Coronado would stop his advance? Should they never have pulled out their Tasers to begin with? Should they have tried harder to deescalate the situation before Mr. Coronado left his apartment? Should they have used less-lethal force by physically engaging with Mr. Coronado instead of Tasering him? While each question is valid and deserves thorough thought, the court is not called upon to answer such questions. Neither is it the court's role to second guess the officers after the fact. The court is mindful, however, that among the answers to such questions are the possibilities that Mr. Coronado would not have been injured or that the Defendant Officers would have been. Under our current paradigm, and the precedent under which this court operates, preventing this latter possibility holds priority over ensuring the former.

Police officers are forced to make "split-second judgments," the consequences of which are often life and death. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The law does not require that the officers' judgment be perfect; it requires that it be reasonable when analyzed under the "totality of the circumstances" that were present and known to the officer at the time, not "with the 20/20 vision of hindsight." *Id.* at 396. The court agrees, however, with the Fourth Circuit that such judgments *must* be made with "respect for the dignity and worth of [a suspect's life]." *Estate of Jones*, 961 F.3d at 673.

This is not a case where the Defendant Officers used deadly force without "respect for the dignity and worth of [Mr. Coronado's life]," and Mr. Coronado was not killed after being shot "22 times as he lay motionless on the ground." *Id.* Rather, Mr. Coronado was Tasered as

he advanced towards police officers, despite receiving warnings to stop, after he had made repeated threats that he would both kill officers and use them to commit suicide "by cop."  While it is unquestionably tragic that Mr. Coronado suffered a traumatic brain injury as a result of being Tasered, such injury does not negate the fact that at the time the Defendant Officers Tasered Mr. Coronado, they reasonably believed that he posed a real threat to their, and his own, safety, and they used non-lethal force to abate that threat.  Under the totality of the circumstances, that use of force was objectively reasonable.

## I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT.

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(A).  As discussed above, the parties here agree, and the court has determined, that there are no genuine issues of material fact that would preclude summary judgment from being granted.   Thus, Defendants' Motion for Summary Judgment presents the court with three question that the court must determine as a matter of law: 1) whether the Defendant Officers' use of force was excessive; 2) whether the Defendant Officers are entitled to qualified immunity; and 3) whether West Valley City is liable for Mr. Coronado's injuries.  Each question will be addressed, and resolved, in turn.

### A. The Defendant Officers are entitled to summary judgment on Mr. Coronado's claims against them because, under the totality of the circumstances, their use of force was objectionably reasonable.

As the court recognized in its Order Denying in Part Defendants' Motion to Dismiss (ECF No. 49), claims of excessive force are evaluated using an objective-reasonableness standard, which requires a court to ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight" and "depends on whether the totality of the circumstances justified the conduct at issue." *Id.* at 396 (internal citations omitted). The Supreme Court has instructed courts tasked with determining the reasonableness of officers' actions to pay "careful attention to the facts and circumstances of each particular case" and has provided three factors (the "*Graham* Factors") that should be considered in making the decisions: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (*citing Tennessee v. Garner,* 471 U.S. 1, 8–9 (1985)).

Before it can analyze the "facts and circumstances of [this] particular case," the court must first determine what facts and circumstances should be considered in this case. Mr. Coronado argues that only the events that occurred in the approximately thirty-seven seconds between the time that Mr. Coronado exited his apartment and the moment that he was Tasered by the Defendant Officers, being those events captured on the Video, should be analyzed to determine whether the Defendant Officers' use of force here was excessive. (*See* ECF No. 76 at 39). In support of his position, Mr. Coronado cites to, among other cases, *Estate of Ronquillo by & through Estate of Sanchez v. City & Cty. of Denver*, 720 F. App'x 434, 438 (10th Cir. 2017), in which the Tenth Circuit recognized that the *Graham* Factors must be analyzed "at the precise moment that the officer used force." But such an analysis does not require the court to ignore all events that occurred before the Defendant Officers' use of force. Indeed, the Supreme Court has expressly stated that applying such a limited view is inappropriate.

In *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) the Supreme Court recognized that a court cannot apply the objective reasonableness standard mechanically. *Id.* Rather, in determining whether an officer's use of force was objectively reasonable, the court "must make

14

this determination from the perspective of a reasonable officer on the scene, *including what the officer knew at the time*, not with the 20/20 vision of hindsight." *Id.* (citations omitted) (emphasis added). Thus, in order to determine whether the Defendant Officers' use of force on Mr. Coronado was objectively reasonable *at the precise moment that the officers applied it*, the court must consider what the Defendant Officers knew when they pulled the triggers on their Tasers. Such facts are integral to the "totality of the circumstances" that this court must measure in determining whether "force qualifies as constitutionally excessive." *See In re Estate of Bleck ex rel. Churchill*, 643 F. App'x 754, 756 (10th Cir. 2016) (citing *Graham*, 490 U.S. at 396).

As is relevant here, and as is more thoroughly discussed above in the court's Findings of Facts, at the time they Tasered Mr. Coronado, the Defendant Officers knew, among other things, that Mr. Coronado: 1) had threatened to commit suicide; 2) had made comments that he wanted to commit suicide "by cop"; 3) had threatened to kill members of his family, the officers, and anyone in the building; 4) had stated that he had booby-trapped his apartment with explosives; and 5) had weapons in his apartment. It is in light of this knowledge that the court must analyze the three *Graham* Factors to determine whether the Defendant Officers' use of force was excessive or objectively reasonable.[14]

---

[14] Mr. Coronado argues that "[t]he facts have not changed" since the court applied the *Graham* Factors to deny Defendants' Motion to Dismiss and that all three *Graham* Factors still weigh in favor of grating him summary judgment (and denying Defendants the same). (ECF No. 76 at 7–8). While the facts of this case may not have changed, the scope of facts that the court is permitted to now consider certainly have. In ruling on Defendants' Motion to Dismiss, the court was required to "accept as true all of Plaintiffs' well-pled factual allegations and view those allegations in the light most favorable to Plaintiffs." (ECF No. 49 at 4 (citing *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013))). As such, "for purposes of [that] motion, the court accept[ed] Plaintiffs' assertion that 'Mr. Coronado neither expressed nor exhibited any aggression toward the officers' and reject[ed] Defendants allegation that Mr. Coronado 'aggressively lunged towards' the officers." (*Id.* (citing ECF No. 3, at ¶ 37, ECF No. 18, at p. 5, ¶ 10)). Now, on summary judgment, the court must analyze the circumstances that played out on August 3, 2016, as well as the views and understandings of the Defendant Officers, and determine whether the totality of the same establishes that the Defendant Officers' use of force was objectively reasonable. As such, the court is neither bound nor guided by the findings it made in its February 15, 2019 Order denying Defendants' Motion to Dismiss. (ECF No. 49).

1. *The first Graham Factor weighs in favor of a finding that the Defendant Officers'
   use of force was objectionally reasonable.*

The first *Graham* Factor concerns the severity of the crime at issue.  When the Defendant

Officers Tasered Mr. Coronado, they had knowledge that he had: 1) threatened to kill members

of his family; 2) threatened to blow up his apartment; 3) threatened to kill officers; and 4)

threatened to commit suicide at his own hand and "by cop."[15]  Because threatening to commit

suicide is not a crime, it "it is impossible for this court to measure the 'severity of the crime at

issue.'"  *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005).  Mr. Coronado

argues that the remaining three offenses are only misdemeanors, and as such, are not severe.

While the Tenth Circuit has recognized that "evaluating severity using the

felony/misdemeanor distinction is 'consistent with the many cases in which we have held that the

first *Graham* factor may weigh against the use of significant force if the crime at issue is a

misdemeanor,'" this distinction is not decisive on the question of whether a crime is severe.  *See*

*Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1061 n. 2 (10th Cir. 2020)

(quoting *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018)).  Indeed, the Tenth Circuit

recently recognized that this distinction is "insignificant" when the suspect is putting officers'

lives at risk but is "relevant to whether the officer was reasonable in evaluating ambiguous

conduct to assess the threat."  *Id*. at 1061.  As such, the fact that Mr. Coronado was only arrested

for, and ultimately charged with, misdemeanor offenses does not mean that the first *Graham*

Factor automatically weighs in his favor.  Each crime must be analyzed in turn to determine if,

---

[15]  Mr. Coronado was ultimately charged with: 1) threatening with or using dangerous weapon in a fight or quarrel;
2) threat of violence (domestic violence); 3) commission of domestic violence in the presence of a child; 4) threat of
violence; 5) interference with peace officer; and 6) intoxication.  (ECF No. 67-12).  Of course, at the time the
Defendant Officers Tasered Mr. Coronado, they could not have known what charges the prosecutor would eventually
decide to bring against him.  As such, it is the conduct that the Defendants Officers witnessed, or had knowledge of,
that are relevant to the first *Graham* Factor.  Moreover, these four threats underly the charges that were ultimately
brought against Mr. Coronado.

given the totality of the circumstances known to the officers at the time they Tasered Mr. Coronado, it was severe.

While Mr. Coronado's threat to kill members of his family constitutes a threat to commit a serious crime of violence, the risk of him being able to carry out that threat had subsided by the time the Defendant Officers Tasered him.  Mr. Coronado's family members had left the apartment and were safe on the ground with officers of the West Valley City Police Department.  (*See* ECF No. 67-7 at 5).  Thus, while the threat of such a crime is serious, it does not support the Defendant Officers' use of force here.

Mr. Coronado's threats to blow up his apartment and to kill officers were, however, still continuing to present serious risks at the time that he was Tasered.  Although those threats may only have been misdemeanors, this distinction is "insignificant" because Mr. Coronado was capable of imminently carrying out those threats, jeopardizing the safety of the Defendant Officer.  *See Dodge*, 967 F.3d at 1061, n. 2.  Officer Olsen knew that Mr. Coronado had claimed that he had rigged his apartment with explosives and had made threats that he would detonate those explosives.  (*See* Olsen Deposition, ECF No. 77-5 at 103:14–24).  As such, Officer Olsen perceived Mr. Coronado's advanced towards him as an attempt to regain entry into his apartment so that he could "cause further harm," and he feared[16] that if Mr. Coronado got back into his apartment, he may carry out his threats, placing everyone in the vicinity in danger.  (*See id*. at 69:22–25, 131:18–134:22, 136:9–14).  That the Defendant Officers interpreted Mr. Coronado's advance towards them as an imminent threat is bolstered by the fact that the Defendant Officers were aware of Mr. Coronado's prior threats that he would kill or harm officers. (See Olsen Deposition, ECF No. 77-5, at 103:14–24, 127:14–18, 133:5–135:12, 136:9–14; Hill Deposition,

---

[16]  As is discussed in Section I.A.2.b, below, the court finds that this fear was reasonable.

ECF No. 77-6, at 45:10–32, 73:11–22, 90:20–91:15).  Because the Defendant Officers reasonably believed that Mr. Coronado was in the position to carry out the threats he had made against them, those threats constituted severe crimes.

In sum, although the crimes for which Mr. Coronado was ultimately charged were misdemeanors, because they involved threats of violence that Mr. Coronado was reasonably foreseeable of carrying out, at the time he was Tasered, the crimes were "severe."  As such, the first *Graham* Factor weighs in favor of finding that the Defendant Officers' use of force was objectively reasonable.

      2.   *The second Graham Factor supports a finding that the Defendant Officers' use of force was objectively reasonable.*

The second *Graham* Factor requires this court to determine whether Mr. Coronado posed "an immediate threat to the safety of the officers or others."  *See Graham*, 490 U.S. at 396.  The Tenth Circuit has recognized that this factor "'is undoubtedly the most important factor in determining the objective reasonableness of an officer's use of force,'" particularly when "the issue is whether an officer reasonably believed that he faced a threat of serious physical harm." *Dodge*, 967 F.3d at 1060–61 (quoting *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017), citing *Thomas v. Durastanti*, 607 F.3d 655. 664 (10th Cir. 2010)).[17]

Here, based upon the Video and the Defendant Officers' deposition testimony, the court

---

[17]  In its Order Denying Defendants' Motion to Dismiss (ECF No. 49), the Court relied on *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) in establishing that the second *Graham* Factor weighed in Mr. Coronado's favor.  There, the Tenth Circuit recognized that the second *Graham* factor "weigh[ed] heavily" in plaintiff's favor even though he "'walked toward the group of officers' . . . which might present some threat," because he "carried no weapon, made no overt threats, and did not get within reach."  While this case supported Mr. Coronado on a motion to dismiss, where the court accepted his representation that he "'neither expressed nor exhibited any aggression toward the officers' and reject[ed] Defendants allegation that Mr. Coronado 'aggressively lunged towards' the officers."  (ECF No. 49 at 4. (citing ECF No. 3, at ¶ 37, ECF No. 18, at p. 5, ¶ 10)), now that the court may view a full record, it finds that the case supports the Defendants.  As discussed more fully herein, Mr. Coronado made overt threats to the Defendant Officers and was quickly getting within reach to potentially carry out those threats when he was Tasered.  Thus, the threat Mr. Coronado posed to the Defendant Officers was greater than that presented in *Morris*, and as such, on summary judgment, the court finds that *Morris* supports finding that the second *Graham* Factor weighs in favor of the Defendant Officers' use of force being objectively reasonable.

finds that Mr. Coronado posed two potential threats to the Defendant Officers: 1) the threat that he would physically attack them and 2) the threat that he would regain access to the apartment and detonate, or obtain a weapon in, the same.  The court must analyze both potential threats to determine whether: 1) they involved immediate and serious physical harm; 2) the Defendant Officers believed that they could cause serious physical harm; and 3) the Defendant Officers' belief was objectively reasonable.  *See Dodge*, 967 F.3d at 1060–61.

Before it answers these questions, the court pauses to address the conflict between Mr. Coronado stated reasons as to why he advanced towards the Defendant Officers and the Defendant Officers' interpretation of that advance.  At his deposition, Mr. Coronado testified that he did not know why he walked towards the Defendant Officers but that he was not advancing on them to harm them and that his apartment was not rigged with explosives.  (*See* Mr. Coronado Deposition, ECF No. 83-3 at 217:7–9, 224:21–225:6, 228:12–15, 228:17–229:9, 194:17–19).  For purposes of Defendants' motion, the court assumes that Mr. Coronado indeed did not intend to harm the Defendant Officers.  However, at the time they Tasered Mr. Coronado, the Defendant Officers did not know this, and the question before the court is whether the Defendant Officers *reasonably believed* that Mr. Coronado *might* have attacked them, detonated an explosive, or retrieved a weapon in his apartment, not whether he was, in fact, going to do so.

     a.   <u>The Defendant Officers' fear that Mr. Coronado would push them down the stairs was objectively reasonable, and the Defendant Officers reasonably believed that a potential attack from Mr. Coronado could cause them serious and immediate harm.</u>

Officer Hill testified that he viewed Mr. Coronado's advance towards him as a threat, stating that Mr. Coronado "advance[d] towards [him] aggressively"  and that Mr. Coronado "aggressed" towards him with his fists clenched and his chest puffed.  (Hill Deposition, ECF No. 77-6 at 73:11–22; 90:20–91:15).  Officer Olsen testified that he feared that by advancing towards

them, Mr. Coronado could push him down the steps of the fourth-story landing.  (Olsen

Deposition, ECF No. 77-5 at 133:5–134:17).  He further stated that the potential of being pushed

down the stairs was "very dangerous" as his position was "over three-and-a-half floors down to

the cement" which was "very dangerous."  (*Id*. at 133:18–23).  As such, the threat the Mr.

Coronado would attack the Defendant Officers and push them down the stair presented potential

immediate and serious physical harm, and the Defendant Officers believed that the threat could

cause serious them physical harm.  The critical question is whether this belief was reasonable.

*See Dodge*, 967 F.3d at 1060–61.

Mr. Coronado argues that the belief was not reasonable, arguing that at the time he was

Tasered, Mr. Coronado "was clearly unarmed, intoxicated, wearing only shorts, and making no

threats to the officers."  (ECF No. 76 at 39).  But, as discussed above, not only the actions that

occurred at the time that Mr. Coronado was Tasered are of consequence here, rather, the "totality

of the circumstances" analysis requires that those actions be viewed together with "what the

[Defendant Officers] knew at the time."  *Kingsley*, 576 U.S. at 397.  At the time they Tasered

Mr. Coronado, the Defendant Officers knew that he had, at a minimum, threatened to kill

officers at the scene and had threatened to commit suicide by cop.  (*See* Olsen Deposition, ECF

No. 77-5, at 103:14–24; Hill Deposition, ECF No. 77-6, at 42:1–8, 45:10–32).  Thus, in light of

these threats, the Defendant Officers reasonably viewed Mr. Coronado's advance towards them

as an attempt to carry out the threats he had made and cause them serious physical harm.  *See*

*Dodge*, 967 F.3d at 1060–61.

Mr. Coronado's advance placed the Defendant Officers in a position where they were

reasonably anticipated that they would be required to engage Mr. Coronado, a large man, in a

physical confrontation.  Even through they were several feet from the top of the stairs, risk of

such a confrontation leading to and potentially down the stairs was foreseeable and reasonable, and the Defendant Officers were not required to assume that risk.  The Defendants Officers therefore could have reasonably believed that Mr. Coronado's advance towards them could have caused them serious physical harm, either because he would attack them on the landing or because he intended to commit suicide by cop.  *See Stewart v. City of Prairie Vill., Kan.*, 904 F. Supp. 2d 1143, 1154 (D. Kan. 2012) (noting that a suspect's "desire to commit suicide by cop" suggested "that she posed a threat to the safety of the officers").

> b.  <u>Mr. Coronado's potential reentry into his apartment presented a threat of serious and immediate harm, and the Defendant Officers' belief that Mr. Coronado could seriously and immediately harm them, and others, was objectively reasonable.</u>

The other threat posed by Mr. Coronado's advance was that he would reenter his apartment, where he could either gain access to a weapon or detonate an explosive.  Officer Hill testified that part of reason that the SWAT Team members were on landing was to prevent Mr. Coronado from going back into his apartment.  (*See* Hill Deposition, ECF No. 77-6 at 66:24–67:20).  Similarly, Officer Olsen stated that he believed, and feared, that if Mr. Coronado reentered his apartment, everyone in the vicinity would be in danger.  (*See* Olsen Deposition, ECF No. 77-5 at 134:18–22).  The threat that Mr. Coronado would reenter his apartment presented a threat of immediate and serious physical harm, and the Defendant Officers believed that if he reentered the apartment, they could be seriously harmed.  The court finds that this belief was reasonable.  *See Dodge*, 967 F.3d at 1060–61.

At his deposition, Officer Olsen testified that when Mr. Coronado left his apartment, the door closed but did not latch.  (Olsen Deposition, ECF No. 77-5 at 49:16–18).  As such, it is plausible that had he been able to push past the Defendant Officers, Mr. Coronado could have regained entry into the apartment.  Officer Olsen testified that he believed it was Mr. Coronado's goal to regain entry into his apartment, and that his advance on the Defendant Officers was an

attempt to complete that goal.  (*Id*. at 136:9–14).  He viewed Mr. Coronado as having momentum

that "could easily [have] put [Officer Olsen] on [his] heels" and feared that Mr. Coronado would

knock over or push him and Officer Hill and then be able to gain access to his apartment.  (*Id*. at

134:23–135:2, 135:7–12; 138:9–14).  Thus, at the time that they Tasered Mr. Coronado, the

Defendant Officers reasonably believed that he posed an imminent and serious threat to their

safety, as well as the safety of others in the building.  This fact supports the Defendant Officers'

use of force.  *See Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) (recognizing that

"'where an officer has probable cause to believe that a suspect poses a threat of serious physical

harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by

using deadly force'" (citations omitted)).

> 3.  *The third Graham Factor supports a finding that the Defendant Officers' use of force was objectively reasonable.*

The third, and final, *Graham* Factor concerns whether Mr. Coronado was actively

resisting arrest or attempting to evade arrest by flight.  The Video shows that Mr. Coronado was

never told that he was under arrest.  (*See* Video, ECF No. 18-1 at 0:00–0:50; ECF No. 83-10).

As discussed above, at his deposition, Mr. Coronado gave conflicting testimony as to whether or

not he understood that the officers were there to arrest him.  (*See* Mr. Coronado Deposition, ECF

No. 83-3 at 164:22–165:3, 172:23–173:1).  Viewing these facts in the light most favorable to Mr.

Coronado, the court concludes for purposes of Defendants' motion that Mr. Coronado did not

understand that he was under arrest.  *Commercial Union Ins. Co.*, 251 F.3d at 1298.

Although Mr. Coronado may not have understood that he was under arrest,[18] it is clear

from the Video that he ignored commands from the officers to get on the ground and instead

advanced towards the Defendant Officers.  (*See* Video, ECF No. 18-1 at 0:00–0:50; ECF No. 83-

---

[18]  *See*, *supra*, Note 7.

10).  While the court cannot know Mr. Coronado's intent for advancing toward the officers was

at the time, (*see* Mr. Coronado Deposition, ECF No. 83-3 at 217:7–9, 224:21–225:6, 228:12–15),

as discussed above, the Defendant Officer's reasonably interpreted the advance as an intention to

either attack them or regain entry into his apartment.  It is the Defendant Officers' reasonable

understating that is relevant to this factor, not Mr. Coronado's intent expressed after the fact.

The officers could have therefore reasonably concluded that such actions constituted resistance.

*See Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1252 (10th Cir. 2013) (recognizing that

even if a suspect's passive resistance did not support a finding that the third *Graham* Factor was

satisfied, a suspect's conduct of ignoring officers' commands to halt, possibly having a weapon,

and intended on "entering a house where her husband and other officers were located" could lead

"[a] reasonable officer" to conclude "that her resistance justified some level of force").

Thus, the court must weigh Mr. Coronado's refusal to comply with commands and the

Defendant Officers' belief that he was attempting to attack them or regain entry into his

apartment.  In doing so, the court notes that less than four seconds elapsed between the time that

Mr. Coronado took his first step toward the Defendant Officers and the time that they Tasered

him, and that all of their commands to stop were given in this brief window of time.  (*See* Video,

ECF No. 18-1 at 0:44–0:49).  Considering that the court must determine the reasonableness of

the Defendant Officers' actions based on what was known to them, not on what Mr. Coronado

now claims, the court concludes that the Defendant Officers had a reasonable basis to believe

that Mr. Coronado was resisting arrest and as such, that the Third *Graham* factor weighs in favor

of Defendants' use of force.

In sum, all three *Graham* Factors, including the "undoubtedly . . . most important"

second factor, support a finding that the Defendant Officers' use of force here was objectively

reasonable.  As such, the court concludes that "the totality of the circumstances justified" the Defendant Officers' use of Tasers on Mr. Coronado and that such use of force was therefore objectively reasonable.  *See Graham*, 490 U.S. at 396.  The Defendant Officers are therefore entitled to summary judgment on Mr. Coronado's claims against them.

> **B.  Because the Defendant Officers' use of force was objectively reasonable, the court need not determine whether Mr. Coronado's claims are barred by qualified immunity.**

Defendants assert, as an alternative ground for relief, that they are protected from Mr. Coronado's claims under a theory of qualified immunity.  Because the court's finding that the Defendant Officers' use of force was objectively reasonable resolves Mr. Coronado's claims against them, the court need not address the Defendant Officers' alternative argument for relief.

> **C.  West Valley City is entitled to summary judgment on Mr. Coronado's claims against it.**

"The Supreme Court has made clear that 'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'"  *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Instead, to prevail on a § 1983 claim against a governmental entity, as Mr. Coronado attempts to do here, a plaintiff must show that the "'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  *Id.* (quoting *Monell*, 436 U.S. at 694).  Mr. Coronado argues that West Valley City has executed such an injurious policy or custom through "'the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval'" and/or "'the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'"  *Id.* (quoting *Bryson v.*

24

*City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

Because the court has determined, as is more fully discussed above, that the Defendant Officers' use of force was not excessive, Mr. Coronado's claim against West Valley City fails. "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). Defendants are therefore entitled to summary judgment on Mr. Coronado's claims against West Valley City.

Further, and after analyzing the merits of the claims, the court finds that Mr. Coronado's claims against West Valley City are unsubstantiated and therefore fail as a matter of law. Mr. Coronado first relies on a theory of ratification to show that West Valley City has executed an injurious policy or custom, alleging that "final policymakers" ratified the Defendant Officers' decisions and the basis for them. In support of this allegation, Mr. Coronado asserts that "Deputy Chiefs at [West Valley City Police Department] knowingly tolerated and excused an unconstitutional practice of tasing a citizen for mere non-compliance." (ECF No. 82 at 37–38). Even if the court accepts that Mr. Coronado was Tasered "for mere non-compliance," which as discussed above it does not, Mr. Coronado has failed to show, as is necessary to establish municipal liability that these Deputy Chiefs were "final policymakers" for West Valley City. *See Waller*, 932 F.3d at 1283. Mr. Coronado's claim for liability under a theory of ratification therefore fails as a matter of law.

Mr. Coronado next relies on a theory of inadequate training to hold West Valley City liable. To prevail under such a theory, Mr. Coronado "'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *Id*. at 1284 (citation omitted). This deliberate indifference standard "'may be satisfied when the

municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'" *Id.* at 1284 (citation omitted). "'In most instances, notice can be established by proving the existence of a pattern of tortious conduct.'" *Id.* (citation omitted). "Deliberate indifference 'may be found absent a pattern of unconstitutional behavior' only in 'a "narrow range of circumstances"' where 'a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction.'" *Id.* (citations omitted). Here, Mr. Coronado alleges that the Defendant Officers' use of Tasers against Mr. Coronado violated West Valley City policy, and that this violation shows that the West Valley City has failed to adequately train its officers. Even if the court were to accept Mr. Coronado's argument that the Tasering here was a violation of policy, this would not be enough to show deliberate indifference on behalf of West Valley City. *See id.* As such, Mr. Coronado has failed to establish that West Valley City inadequately trained its officers, and West Valley City is therefore entitled to summary judgment on Mr. Coronado's claims against it.

## II.  MR. CORONADO IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT.

As noted above, "[c]ross-motions for summary judgment are to be treated separately," and "the denial of one does not require the grant of another." *Buell Cabinet Co.*, 608 F.2d at 433. As such, the court now turns to Mr. Coronado's Motion for Partial Summary Judgment, which asks the court to find, as a matter of law, that the undisputed facts of this matter establish Defendants' liability.

### A.  Because the Defendant Officers' use of force was objectively reasonable, Mr. Coronado is not entitled to summary judgment on the issue of the Defendant Officers' liability.

As discussed above, under the totality of the circumstances, the Defendant Officers' use of force here, their Tasering of Mr. Coronado, was objectively reasonable. As such, Mr.

Coronado cannot, as a matter of law, establish that the Defendant Officers are liable to him for the injuries that he suffered as a result of the Tasering.  Thus, Mr. Coronado is not entitled to summary judgment against the Defendant Officers on the issue of their liability.

**B.  Because Mr. Coronado has failed to establish that he was injured as a result of West Valley City's injurious policy or custom, he is not entitled to summary judgment on the issue of its liability.**

Mr. Coronado seeks summary judgment on the issue of West Valley City's liability. However, as discussed in Section I.C., above, he has failed to establish that "final policymakers" for West Valley City ratified the Tasering of Mr. Coronado here, and as such, cannot prevail under a theory of ratification.  Similarly, Mr. Coronado cannot prevail under a theory of inadequate training, as he has not established that West Valley City acted with "deliberate indifference" in its alleged failure to properly train the Defendant Officers.  Having failed to establish necessary elements of the two theories of liability on which his claims against West Valley City are based, Mr. Coronado is not entitled to summary judgment on his claims against West Valley City.

## CONCLUSION

For the reasons stated above, the court **HEREBY GRANTS** Defendants' Motion for Summary Judgment (ECF No. 66) and **DENIES** Mr. Coronado's Motion for Partial Summary Judgment (ECF No. 82).

DATED this 30th day of September, 2020.

BY THE COURT:

Clark Waddoups
United States District Judge